## UNITED STATES v. 323 PACKAGES OF "KIL-TONE."

(Circuit Court of Appeals, Third Circuit. February 24, 1922.)

No. 2695.

I. Druggists ⊕⇒11—Insecticide not "adulterated" or "misbranded" by addition of water.

   An insecticide or fungicide known as "Kil-Tone" was not adulterated or misbranded by reason of addition of water to the net weight to take care of evaporation, though it increased the volume of the contents of the package, and may have caused the proportion of the active ingredients to appear less than called for by the labels; it being stated on the label that water was added "in addition to the net weight."

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adulterate—Adulteration; Misbrand—Misbranding.]

---

**2. Appeal and error ⬤⟿999(1)—Facts found by jury not re-examined.**

   It is beyond the power of a Circuit Court of Appeals to re-examine the facts as found by the jury in the District Court, and its verdict cannot be disturbed, unless the court committed substantial error.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Proceeding by the United States for the seizure and condemnation of 323, more or less, packages of adulterated and misbranded insecticide and fungicide, labeled "Kil-Tone." From an adverse judgment, plaintiff brings error. Affirmed.

George W. Coles, U. S. Atty., Truman D. Wade, Asst. U. S. Atty., and Robert J. Sterrett, all of Philadelphia, Pa., for the United States.

Albert T. Hanby, of Philadelphia, Pa., for defendant in error.

Before WOOLLEY and DAVIS, Circuit Judges, and ORR, District Judge.

ORR, District Judge. The proceedings instituted in the court below were for the seizure and condemnation of certain packages shipped in interstate commerce, alleged to have been adulterated and misbranded in violation of the provisions of an act of Congress approved April 26, 1910 (36 Stat. 331), known as the "Insecticide Act of 1910" (Comp. St. §§ 8765–8777). Said act of Congress denounces the introduction from one state into another "of an insecticide or paris green or lead arsenate or fungicide which is adulterated and misbranded within the meaning of the act." Section 7 of said act declares what for the purpose of the act shall be meant by adulteration in the following language:

"In the case of insecticides or fungicides, other than paris green and lead arsenate: First, if its strength or purity fall below the professed standard or quality under which it is sold; second, if any substance has been substituted wholly or in part for the article; third, if any valuable constituent of the article has been wholly or in part abstracted; fourth, if it is intended for use on vegetation and shall contain any substance or substances which, although preventing, destroying, repelling, or mitigating insects, shall be injurious to such vegetation when used."

Section 8 of said act declares what shall be embraced within the term "misbranded," at considerable length, embracing generally false or misleading statements, designs, or devices regarding the article or the ingredients and substances contained therein. There follows in said section an elaboration of what shall be deemed misleading statements, which is followed by a more particular statement of what shall be deemed to be misbranded in language following:

"In the case of insecticides (other than paris greens and lead arsenates) and fungicides: First, if it contains arsenic in any of its combinations or in the elemental form and the total amount of arsenic present (expressed as per centum of metallic arsenic) is not stated on the label; second, if it contains arsenic in any of its combinations or in the elemental form and the amount of arsenic in water-soluble forms (expressed as per centum of metallic arsenic) is not stated on the label; third, if it consists partially or completely of an inert substance or substances which do not prevent, destroy, repel, or mitigate insects or fungi and does not have the names and percentage amounts of each and every one of such inert ingredients plainly and correct-

ly stated on the label: Provided, however, that in lieu of naming and stating the percentage amount of each and every inert ingredient the producer may at his discretion state plainly upon the label the correct names and percentage amounts of each and every ingredient of the insecticide or fungicide having insecticidal or fungicidal properties, and make no mention of the inert ingredients, except in so far as to state the total percentage of inert ingredients present."

The case came to trial upon the issues raised by the pleadings: First, were the packages misbranded? Second, were the contents of the packages adulterated within the meaning of the act? Both were negatived by the verdict of the jury in favor of the respondent. That a clearer understanding may be had of the questions raised, some reference may be made to the evidence. The label, after referring to the contents as "an adhesive combined insecticide and fungicide for ground crops only," classifies the ingredients as "active ingredients" and "inert ingredients." The former are "total copper" (expressed as metallic) and dry lead arsenate and the minimum and maximum percentages of each are expressed. The minimum and maximum percentages of "inert ingredients" are expressed. Included among the latter are total arsenic (expressed as metallic) and arsenic in water-soluble forms (expressed as metallic), and the percentage of each is expressed. On the label are these directions:

"Mix the required quantity in a gallon or two of water and when thoroughly mixed add this to the full quantity of water. For garden use mix one heaping teaspoonful Improved Kill-Tone to one quart water for all ordinary purposes."

There was evidence that on the packages there was stamped the net weight, and also "water added in addition to net weight."

Evidence on the part of the respondent tended to show that, after the net weight of the product had been placed in the package, water was added to keep the material moist for the benefit of the user, who was required to pay for the net weight only and not for the added water. The theory on the part of the government is that such addition of the water, although to take care of evaporation, was an illegal adulteration, and so changed the percentages of ingredients as to destroy their conformity to the percentages expressed on the label, and therefore also resulted in a misbranding in violation of the act of Congress.

[1] In reading the testimony, there is suggested a cause for the differences between the chemical analyses by the government witnesses and those which were set forth upon the labels, in that the government witnesses did not apparently take into consideration that, according to the notice on the label, water had been added in addition to net weight, and perhaps, had they evaporated the water sufficiently to have obtained the net weight of the package before making a chemical analysis, there might have been very little, if any, difference in the respective analyses. The addition of water to the net weight undoubtedly increased the volume of the contents of the package, and may have caused the proportion of the active ingredients to appear less than called for by the labels. There was no evidence tending to show that water had been substituted for any other ingredient. Water itself was a necessary ingredient, as appears by the testimony, and the article was

intended to be used in a spray after it had been placed in large quantities of water by the ultimate user. The addition of water, therefore, to the mixture, after it had been placed in the container, could not be deemed an adulteration, when the net weight of the article was given, and the statement made that water had been added in addition thereto.

[2] It is beyond the power of this court to re-examine the facts as found by the jury. If the court committed no substantial error upon the trial, the verdict and judgment entered thereupon cannot be disturbed.

The court did not answer seriatim any of the points submitted by either side, but generally affirmed or refused the same in accordance with expressions in the general charge to the jury, and allowed an exception generally to the answer to each point as found in the charge.

It is scarcely necessary to consider in detail the various assignments of error. None of them has any merit. The jury was instructed fully in such a way as to leave no doubt in their minds as to what the real issues were.

Judgment affirmed.